Filed 3/8/22  In re Jordan W. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JORDAN W. et al., Persons Coming Under the Juvenile Court Law. | B314295 (Los Angeles County Super. Ct. No.19CCJP05744) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GEORGE W. and NAKISHA C., <br><br> Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin R. Kesler, Juvenile Court Referee. Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant George W.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant Nakisha C.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

_____

George W. (Father) and Nakisha C. (Mother) appeal from the juvenile court's order terminating their parental rights over four-year-old Jordan W. and three-year-old George W., Jr., (George).  Father contends the juvenile court abused its discretion in denying his request for a continuance of the selection and implementation hearing (Welf. & Inst. Code,[1] § 366.26).  In addition, Mother and Father argue the court erred in finding the beneficial parental relationship exception to termination of parental rights did not apply.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Dependency Petition*

On September 5, 2019 the Los Angeles County Department of Children and Family Services (Department) filed a dependency petition on behalf of then-two-year-old Jordan and then-18-month-old George.  The petition alleged Father and Mother

---

[1]    Further statutory references are to the Welfare and Institutions Code.

2

engaged in domestic violence in the presence of the children. On one occasion, Father grabbed Mother's neck with both his hands, and Mother struck Father in the face. Another time, Father hit Mother in the eye, causing it to be bruised and swollen shut. The petition also alleged Father had a history of substance abuse and abused amphetamine, methamphetamine, and marijuana, which rendered him incapable of caring for the young children. Mother was aware of Father's substance abuse and failed to protect the children by allowing Father to reside in the home.

At the December 18, 2019 jurisdiction and disposition hearing, Mother and Father pleaded no contest to the allegations in the amended petition that they had a history of engaging in altercations in the presence of the children; Father had a history of substance abuse and was a recent user of amphetamine, methamphetamine, and marijuana; and Mother failed to protect the young children by allowing Father to reside in the home. The juvenile court sustained the amended allegations under section 300, subdivision (b)(1), and declared Jordan and George dependents of the court. The court removed the children from Father's physical custody and ordered them released to Mother with family maintenance services.

B. *The Section 342 Petition*

On February 10, 2020 the Department filed a subsequent dependency petition (§ 342) on behalf of Jordan and George. The petition alleged Mother had a history of substance abuse and was a current abuser of methamphetamine and amphetamine, which rendered her incapable of caring for the children. Mother tested positive for methamphetamine and amphetamine on January 29, 2020. Further, mother's other children, Tamia C. and Isaiah C.,

3

received permanent placement services, and two of her other children (Darryn S. and Jordan) were former dependents of the court because of Mother's substance abuse.

At the February 11, 2020 detention hearing, the juvenile court detained Jordan and George from Mother. The court ordered monitored visits for Mother and Father twice a week for two hours each visit.

On June 23, 2020 the court sustained the allegations in the section 342 petition under section 300, subdivisions (b)(1) and (j). The court removed the children from Mother's physical custody and granted family reunification services to Mother and Father. The court ordered Mother and Father to a participate in a six-month drug and alcohol program with aftercare, random drug testing every other week, parenting classes, individual counseling to address case issues, and conjoint counseling if the parents reconciled. The court also ordered Father to attend a program for domestic violence perpetrators.

C.    *Status Review Reports*

The December 14, 2020 six-month status review report stated Mother had attended only two parenting classes and had not completed her drug treatment program. Mother tested positive for methamphetamine and amphetamine three times from January to September 2020. Father did not attend individual counseling, but he completed parenting classes and a six-month drug treatment program. Father tested positive for methamphetamine, cocaine, and marijuana on five occasions from September 2019 to February 2020. Father also tested positive for marijuana four times from December 2019 to October

4

2020. Further, Mother and Father failed to show for drug testing for the Department on numerous occasions in 2020.

The paternal grandmother, who was the approved monitor, reported Father interacted well with the children and was responsive to their needs. The social worker observed Father brought food, toys, and clothes to the visits and appeared to be caring and attentive to the children. Likewise, Mother's monitored visits were going well. Mother demonstrated patience with the children and redirected them when needed.

The 12-month status review report stated Mother failed to complete a drug treatment program and parenting classes. Mother did not consistently drug test, and she tested positive for methamphetamine on March 16, 2021. Mother stopped attending individual counseling sessions on February 17, 2021 after attending only 10 sessions. Father had failed to attend any domestic violence classes. He also failed to submit to drug testing after July 2020. Father reported he regularly attended individual counseling, but the social worker was unable to contact his counselor. Mother and Father separated on February 5, 2021 after Mother accused Father of physical assault; Father denied the allegation. However, the foster mother reported that when she returned Mother's phone call on March 14, Father answered the call on Mother's cell phone.

Mother visited the children for two hours on Sundays. The maternal grandmother, who monitored the visits, reported Mother was attentive toward the children. Mother consistently visited except for a month when she was in Louisiana. Father visited the children every Friday for four hours. According to the paternal grandmother, who monitored the visits, Father interacted well with the children and was responsive to their

5

needs. The social worker observed Father brought food, bikes, toys, and clothes to the visits and was attentive and caring toward the children.

At the April 9, 2021 12-month review hearing (§ 366.21, subd. (f)), the juvenile court found Mother and Father had shown minimal compliance with their case plans. The court terminated the parents' family reunifications services and set a selection and implementation hearing for August 9, 2021.

D.    *The Department's Assessment of Relatives for Placement*

On April 27, 2021 the social worker spoke with adult sibling Jazmen W., who wanted to have Jordan and George placed with her. Jazmen stated, "'I have seen them. I don't live out there so I don't have regular contact. Last time I saw them was two years ago. I offered because [M]other is making it difficult for [Father] to get the kids. I've always put it out there that I can take them but my dad was trying to get them.'" Jazmen lived in a three-bedroom, two-bathroom home with her five children ranging from seven to 15 years old. Jazmen reported she and her husband were separated and he did not "'need to be involved.[']" The social worker noted, "With medical, regional center, mental health and educational needs of the children, along with her five children[,] it would be a significant impact on the home and it is unknown her ability to care for seven children in her home."

On May 21, 2021 the juvenile court granted Father's request for the Department to assess the paternal grandmother, Samella J., for long-term placement of the children. Samella J., had previously requested the children be placed with her, but at the time Father was living with her. Samella lived with the

paternal aunt, Sherry W., in a one-bedroom apartment. Sherry had arrests for possession and use of controlled substances, disorderly conduct, and prostitution. Further, Sherry lost custody of her child in a dependency case. The Department did not approve Samella's home for placement or adoption because the social worker had not received a criminal waiver for Sherry. Samella denied knowledge of Sherry's arrests or prior dependency case even though Samella was the caregiver for Sherry's child during the dependency proceedings. Further, Samella reported she did not have the strength to pick up Jordan or George or to keep up with them during visits because of her age. The social worker expressed concerns about Samella's ability to meet the children's daily needs if they were placed long-term with Samella. Moreover, Samella did not drive and relied on Father and Sherry for transportation. The social worker was also concerned about Sherry's willingness to work with the Department. When a social worker called Sherry to obtain information regarding a June 18, 2021 referral alleging abuse of Jordan and George, Sherry denied knowledge of the abuse and hung up.

On June 15, 2021 Father filed a section 388 petition requesting the children be placed with Samella. The juvenile court summarily denied the section 388 petition because "it does not state new evidence or a change of circumstances." The minute order noted the court "already ordered Paternal Grandmother to be assessed."

E.     *The Section 366.26 Report*

The July 26, 2021 section 366.26 report stated four-year-old Jordan and three-year-old George had been in five different

7

placements since the detention hearing. The current caregivers, who had cared for the children since February 2021, wanted to adopt them. The prospective adoptive parents were very attentive and dedicated to providing for the children's needs. George was diagnosed as autistic and was receiving speech therapy. Jordan was referred for mental health services because she was physically aggressive and had oppositional behavior. She also had angry outbursts and tantrums because she had difficulty regulating her emotions.

The report stated as to visitation, "[Mother] is scheduled to visit the children on Sundays from 10 a.m. to 2 p.m. [¶] [Father] continues to have monitored visits with his children every Friday from 3:30 to 7:30 p.m. [¶] On 07/19/2021, the caregiver reported that [maternal grandmother] monitors the visits between the parents and . . . there [have] been times she has suspected that father is present during mother's visit."

F.    *Father's Second Section 388 Petition*

On the morning of the August 9, 2021 selection and implementation hearing, Father filed another section 388 petition, requesting six months of family reunification services. The petition stated, "Father has maintained consistent and close visitation with the children, who have been placed in a number of homes since this case started. The children's best interest arises through permanent placement with [him]." Father attached an August 2, 2021 progress letter from his counselor at the drug treatment aftercare program showing that Father enrolled in the program on August 17, 2020. Father took classes on drug education, relapse prevention, domestic violence awareness, parenting, coping skills, and anger management. He also tested

8

negative for drugs on five occasions between April and July 2021. But Father had been inconsistent with his therapy sessions.

After hearing argument from counsel, the juvenile court summarily denied Father's section 388 petition. The court acknowledged that Father had been visiting the children regularly, but Father's clean tests over a four-month period did not show he could remain sober in light of his previous relapse, and Father had not completed his programs even though the petition was filed over two years earlier.

G. *The Selection and Implementation Hearing*

At the August 9, 2021 selection and implementation hearing, Father orally requested a continuance for the Department to further evaluate Samella and Jazmen for placement. Father argued the juvenile court needed more information because the Department had not denied the relatives' requests for placement, and there was a preference for placement with family members. The court denied the request, finding "the parties have not been forthcoming about the issues, [the] children have been removed from some of these parties, [and the parties have] been outright misleading." The court added, "To take these children who have had a number of placements to an adult sibling who is having her own issues in her family where these kids have had numerous placements does not seem appropriate, especially since she has not had any regular contact with these kids."

Mother's and Father's attorneys argued the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i), applied, and therefore, the juvenile court should not terminate the parents' parental rights. Mother's

9

attorney asserted Mother had consistently visited, and Jordan and George "would benefit from the continuing relationship because [she] has maintained a parental role in these children's lives." Father's attorney argued Father had regular visitation despite the children's five or six placements, and "the family itself seems to be intact, the maternal grandmother is the monitor." Father's attorney added, "[T]he ongoing visitation, ongoing contact with the maternal and paternal relatives does demonstrate that it would be detrimental to the child[ren] if termination of parental rights were to occur today. . . . We don't have the sufficient length of time that the children are staying in this current placement to show that it wouldn't be detrimental if termination of parental rights were to occur. [¶] Given that visitation has been ongoing, the children do have in their minds who the family is. And this court should find that that is [a] sufficient[ly] compelling reason to find that it would be detrimental should the court terminate parental rights." The Department and minors' counsel requested the court terminate Mother's and Father's parental rights.

After hearing argument, the juvenile court found by clear and convincing evidence that the children were adoptable. The court found no statutory exception applied and terminated Mother's and Father's parental rights. The court explained, "While the parents did have custody of these very young kids early on in their lives, the parents for the last significant period of time, almost two years, have been regulated to monitored visits one time a week, which does not rise to a parental relationship with the children." The court added, "As indicated, [the children] may be aware of who the mother and father [are]; however, they do not supply a parental role and have continued to have their

own issues in regards to why this case brings us before this court." The court concluded, "I cannot make a finding that it would be detrimental to sever the parental relationship. And the preference for adoption outweighs the limited relationship the parents have with the kids." The court transferred the care, custody, and control of the children to the Department for adoptive planning and placement and designated the foster parents as the children's prospective adoptive parents.

Mother and Father timely appealed.[2]

## DISCUSSION

A. *The Juvenile Court Did Not Abuse Its Discretion in Denying Father's Continuance Request*

Although "[c]ontinuances are discouraged in dependency cases," they may be granted "upon a showing of good cause, provided the continuance is not contrary to the interest of the child." (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 779; accord, *In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056.) Section 352, subdivision (a)(1), provides, "Upon request of counsel for the parent . . . , the court may continue any hearing under this chapter beyond the time limit within which the hearing is

---

[2] In their notices of appeal, Mother and Father appealed the summary denial of Father's section 388 petition. However, Mother and Father failed to assert any argument on this issue, thereby forfeiting any challenge to the denial of Father's section 388 petition. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [dependency proceedings are subject to forfeiture rule]; *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9, ["the claim is omitted from the opening brief and thus waived"].)

otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor.  In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."

"We review an order denying or granting a continuance for abuse of discretion.  [Citations.]  'To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.'" (*Elizabeth M., supra*, 19 Cal.App.5th at p. 780; accord, *In re D.N.* (2020) 56 Cal.App.5th 741, 756.)

Father contends the juvenile court abused its discretion in denying his request at the selection and implementation hearing for a continuance to allow the Department to assess Samella and Jazmen.[3]  The juvenile court did not abuse its discretion because by the time of the hearing, the Department had already assessed

_____

[3]      Father and Mother also contend the juvenile court abused its discretion in not continuing the hearing to require the Department to prepare a more complete report for the selection and implementation hearing that discussed the monitored visits the parents had with the children.  However, the parents' attorneys did not request a continuance on this basis, forfeiting the contention on appeal.  (*In re S.B., supra,* 32 Cal.4th at p. 1293; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 582 ["A parent's failure to raise an issue in the juvenile court prevents him or her from presenting the issue to the appellate court."].)

Samella and Jazmen and determined they could not provide appropriate placements.

Samella lived with Sherry, who had a criminal history and lost custody of her child. The court found Samella was not "forthcoming" and was "outright misleading" because she denied knowledge of Sherry's arrests and prior dependency case even though she was the caregiver for Sherry's child during the dependency proceedings. Further, Samella reported she did not have the strength to lift Jordan or George or to keep up with them during visits because of her age, casting doubt on her ability to meet the children's daily needs.

Jazmen did not have regular contact with Jordan and George, having last seen them two years earlier. Moreover, Jazmen would be caring for seven children by herself if Jordan and George were placed with her. In light of Jordan's and George's mental health, developmental, and special education needs, the Department questioned Jazmen's ability to care for them along with her five children.

In denying the continuance request, the juvenile court noted Jordan and George "have had a number of placements" and had been in foster care for nearly two years. The court appropriately considered the children's "need for prompt resolution" of their custody status and the damage caused by "prolonged temporary placements," as required under section 352, subdivision (a)(1).

B.    *The Beneficial Parent-child Relationship Exception Does Not Apply*

1.    *Governing law*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225 (*B.D.*); accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), "the parent may avoid termination of parental rights" if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child.  [Citations.]  The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.)

14

Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, at p. 633.) "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C.*, at p. 630; accord, *B.D.*, at p. 1225.)

> 2. *The juvenile court did not abuse its discretion in finding the beneficial parent-child relationship exception did not apply*

Father and Mother contend they regularly visited the children, and the court improperly looked at whether the parents were in a "parental role" in concluding the children would not benefit from continuing their relationship with the parents. Father and Mother also argue that by focusing on whether Father and Mother were in a parental role, the court abused its discretion in finding it would not be detrimental to the children to sever the parental relationship. The Department concedes Father and Mother met their burden to establish regular visitation and contact. But it argues the parents failed to provide

15

any evidence the children would benefit from continuing their relationship with Father and Mother, and the court did not abuse its discretion in finding termination of the relationship would not be detrimental to the children. The Department has the better argument.

At the time of the selection and implementation hearing, Jordan and George had been in five placements during the nearly two-year period since they had been removed from their parents' custody. The children had mental health, developmental, and special education needs. Father and Mother fault the Department for not addressing in the section 366.26 report the nature of the children's interaction with the parents during their monitored visits. They are correct that the section 366.26 report stated only that Father and Mother had weekly visits with the children, without addressing the quality of the parents' visitation. But the six-month and 12-month status reports provided additional information about the parents' visits with the children. According to these reports, the paternal grandmother indicated Father interacted well with the children and was responsive to their needs. The social worker observed Father brought food, toys, and clothes to the visits and appeared to be caring and attentive to the children. Likewise, Mother's monitored visits went well. The maternal grandmother reported that Mother redirected the children when needed and was attentive to them.

Further, the visits with the children were monitored by the maternal and paternal grandmothers, not the social worker. The Department could have (and should have) interviewed the grandmothers to obtain additional information about the quality of the visits, but it was Father and Mother who had the burden to

16

show the children had a substantial, positive emotional attachment to the parents. (*Caden C., supra*, 11 Cal.5th at p. 636.) Father and Mother could have testified at the hearing or called the grandmothers to testify about the children's interactions with their parents. They did neither. Because Father and Mother failed to present any evidence of the children's attachment to the parents, the record supported the juvenile court's finding the parents did not establish that the children would benefit from continuing the relationship with the parents.

Father and Mother also assert the juvenile court improperly considered Father's and Mother's continued substance abuse struggles, citing *Caden C.* for the proposition "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Caden C., supra*, 11 Cal.5th at p. 637.) However, "a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental." (*Id.* at p. 639.) Here, the juvenile court stated at the hearing that the parents "have continued to have their own issues." But this was only one of several issues the court cited in determining the children would not benefit from continuing their relationship with the parents.

As to the argument by Father and Mother that the juvenile court improperly focused on whether the parents occupied a parental role in the children's life, the Supreme Court in *Caden C.* did not bar juvenile courts from considering a parent's "parental role," but rather, explained a court's proper focus is on whether there is a substantial, positive emotional attachment

between the parent and child, taking into account factors such as the age of the child, the portion of the child's life spent in the parent's custody, the effect on the child of his or her interaction with the parent, and the child's particular needs. (*Caden C., supra*, 11 Cal.5th at pp. 632, 636.) Certainly, if the juvenile court only focuses on whether the parent serves a parental role without considering other factors affecting the emotional attachment between the parent and child, the failure to consider other factors could be an abuse of discretion. (See *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210-211 [reversing termination of parental rights where juvenile court's finding prior to *Caden C.* "that the parents 'ha[d] not acted in parental role in a long time'" could have meant they were not "good parents[s]," without a finding whether there was a substantial, positive emotional attachment]; *In re D.M.* (2021) 71 Cal.App.5th 261, 270 [juvenile court abused its discretion in "focusing on whether father occupied a 'parental role' in the children's lives, equating that role with attendance at medical appointments, and understanding their medical needs," instead of determining whether there was a substantial, positive emotional attachment]; *In re J.D.* (2021) 70 Cal.App.5th 833, 865 [reversing termination of parental rights because it was unclear "whether the juvenile court's determination that mother did not occupy a 'parental' role encompassed factors that *Caden C.* deems irrelevant"]; *B.D., supra*, 66 Cal.App.5th at p. 1230 ["The juvenile court's references to the paternal grandmother providing for the children's daily needs, whether the parents occupied a 'parental role' or whether a 'parental relationship' existed are concerning because it is unclear what weight the juvenile court placed on these conclusions when balancing the harm of severing the

18

natural parent-child relationship to the benefits of a new adoptive home in the crucial third step of the analysis."].)

Here, the juvenile court stated Jordan and George "may be aware of who the mother and father [are]; however, [the parents] do not supply a parental role." But the court also found it would not be detrimental to the children to sever the parental relationship because the children had been in foster care for "almost two years" and the parents had "been relegated to monitored visits one time a week." The court determined "the preference for adoption" outweighed "the limited relationship the parents have with the kids." The record does not show that Father and Mother had a substantial, positive emotional attachment with their children, instead only showing that Father and Mother were attentive to the children during their visits and Father brought them things. Further, the record reflects that Jordan and George would benefit from adoption by their caregivers, who had been dedicated to providing for the children's special needs since February 2021. Under these circumstances, the juvenile court did not abuse its discretion in finding Mother and Father failed to "show that terminating [their] attachment would be detrimental to the child[ren] even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

## DISPOSITION

The order terminating Mother's and Father's parental rights is affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.